UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
APR 14 2011
CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | No. 4:11-MJ-116 |
| § | |
| CHRISTOPHER BLACKWELL § | **UNDER SEAL** |
| § | |
| § | |

## CRIMINAL COMPLAINT

I, Special Agent George Ramirez, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

*From on or about 2007 to the present, in the Northern District of Texas, defendant CHRISTOPHER BLACKWELL devised a scheme to defraud investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing that scheme, he caused to be transmitted by means of wire communication in interstate commerce certain signals and sounds, all done in violation of 18 U.S.C. §1343.*

### INTRODUCTION

1.  I am a Special Agent with the U.S. Department of Homeland Security, Homeland Security Investigations and have been so employed for more than 26 years. During my law enforcement career I have participated in the investigation of a variety of criminal offenses, including, complex drug organizations, human smuggling/trafficking organizations, domestic/international terrorism, wire fraud, and financial crimes. I have often acted in an undercover capacity in human smuggling, fraud, and narcotics investigations. I have also participated in all of the traditional methods of investigations, including, but not limited to, electronic surveillance, physical surveillance, witness and subject interviews, the use of search warrants, the use of confidential informants, the use of pen registers, and the use of undercover agents. In the course of such investigations, I have made numerous arrests.

2. The information contained in this Complaint is the result of my own investigation as well as information provided to me by other investigators and law enforcement officers. In each instance when I recite information from such others, I have gained that information either by talking directly to such investigators and law enforcement officers or reviewing written reports of their investigation, or both. This Complaint accurately summarizes the evidence I discovered during my investigation; it does not, however, contain every detail known to me about the investigation.

## THE SCHEME TO DEFRAUD

3. Between approximately 2007 and the present, CHRISTOPHER BLACKWELL, a resident of Colleyville, Texas, has operated a scheme to defraud investors. His scheme can be properly described as a "Ponzi scheme". BLACKWELL makes promises to induce people to give him money, often promising them a high rate of return on their investment, and assuring them that their investment entails little to no risk. BLACKWELL tells investors that their money will be invested in specific ventures. But once BLACKWELL receives money from investors, he does not invest the money in those ventures, but rather uses a majority of the money for his own personal benefit. Occasionally, BLACKWELL uses some of the money he obtains from investors to make small payments to other investors. These are known as "Ponzi payments" and are designed to convince investors that their money is generating a profit. BLACKWELL also occasionally produces false account statements which claim that investments have appreciated, when, in reality, no investment was ever made.

4. During the course of his scheme, BLACKWELL defrauded a number of investors. Although the specific promises he made to each investor varied, the representations were generally similar.

5. Not all investors received Ponzi payments from BLACKWELL, and many lost all of the money they invested.

6. During the course of this investigation, over twenty victims were identified who suffered losses exceeding $4,000,000 as a result of BLACKWELL's investment fraud scheme. Victims identified during this investigation include residents in California, Arizona, Texas, Arkansas, Florida, and Canada. Agents interviewed 25 victims between September, 2009 and the present.

7. During the investigation agents obtained records from numerous bank accounts controlled by BLACKWELL. Agents also obtained bank records for accounts belonging to business associates of BLACKWELL. A review of those revealed that upon receipt of

investor funds, BLACKWELL would consistently and immediately conduct numerous transfers between various bank accounts and would ultimately use the funds to make purchases for his own benefit, make Ponzi payments (i.e., use new investor funds to pay previous investors), and make payments to family members and business associates.

## INVESTOR D.W.

8. On September 30, 2009, agents interviewed D.W., a Dallas, Texas, resident who invested money with BLACKWELL. D.W. invested $325,000 dollars with BLACKWELL. BLACKWELL told D.W. that he would invest D.W's money in ventures that return thirty to forty percent.

9. BLACKWELL told D.W. to where to wire his investment money. D.W. wired the money pursuant to BLACKWELL's instructions. On January 20, 2009 he wired $75,000 to an account designated by BLACKWELL, and on January 21, 2009, he made a second wire transfer of $250,000 to an account specified by BLACKWELL. Agents obtained BLACKWELL's bank records. After reviewing those records, agents were able to determine that BLACKWELL did not invest the money sent to him by D.W. as he had promised. Instead, BLACKWELL used the money for personal expenditures including automatic teller machine withdrawals, dining and entertainment, luxury vehicle expenses and payments to family and business associates.

10. After wiring money to BLACKWELL, D.W. did not receive the payments or returns he had been promised. After several inquiries, BLACKWELL told D.W. that the payments were late because a wire transfer from HSBC had been delayed. BLACKWELL told D.W. that he was going to show him documentation of the wire transfer.

11. On September 30, 2009, D.W. received an email from BLACKWELL with an attached letter purportedly from HSBC. The email originated from BLACKWELL's email account at clblackwell@avbartrust.com. The attachment appeared to be on HSBC letterhead, and purported to show that $250,000 dollars had been transferred to Seiko Investments from HSBC bank. Seiko Investments was the name of a business that D.W. was operating.

12. On September 30, 2009, an HSBC bank fraud representative was contacted regarding the legitimacy of the HSBC document. After receipt and review of the document, the representative stated that the document was fraudulent.

13. On January 27, 2011, HSBC Security and Fraud Risk-Investigations confirmed that the document sent by BLACKWELL to D.W. was fraudulent.

14. To date, D.W. has not received any returns on his investment nor has he received the return of his initial capital.

## UNDERCOVER INVESTIGATION

15. On January 2010, agents searched for BLACKWELL on the internet social network, Facebook. They found an account that matched known information of BLACKWELL and displayed a photograph of BLACKWELL. The facebook account claimed that BLACKWELL was employed as a fund manager of Private Hedge Fund/Trust Funds.

16. On February 10, 2010, an undercover agent made a telephone phone call to BLACKWELL posing as an interested investor. BLACKWELL asked what the undercover agent (UCA) was looking for and the UCA informed BLACKWELL that he was looking for short term investments. BLACKWELL said that he had been doing investments for a long time and had some opportunities available. BLACKWELL asked if UCA's money was liquid and if he was willing to move it.

17. On February 11, 2010, the UCA met with BLACKWELL. BLACKWELL arrived to the meeting in a Black HUMMER bearing Texas license plate BXZ-724. The UCA said that he was interested in investing $500,000 in short term investments. BLACKWELL stated that he had made some calls and confirmed that there was an investment currently available and that the UCA would double or triple his money in 30 – 60 days.

18. Over the next several weeks, BLACKWELL and the UCA discussed several investment options in person, by telephone, and by email.

19. On April 27, 2010, undercover agents conducted another meeting with BLACKWELL. During the meeting, BLACKWELL discussed an investment opportunity, and told the UCA that BLACKWELL would send him an investment contract that afternoon.

20. On April 28, 2010, the UCA received an investment contract via email from BLACKWELL using email address clblackwell@cintiacapital.com. In the body of the email, BLACKWELL indicated that he had attached the "contract for the 500K fund investment". Attached to the email were two documents labeled "Exhibit F" and "Asset

Management Agreement." The Asset Management Agreement consisted of a twenty-nine page document entitled "Limited Bonus Partnership Agreement Bonus Partnership Code: MAG-911DJ007". The document was prepared with the UCA's identifying information included in the document. The asset agreement stated that the UCA's investment ($500,000) would be used to contract with a banking institution to buy and sell Medium Term Notes.

21.    On July 21, 2010, the UCA and BLACKWELL met again at a restaurant. The UCA gave BLACKWELL two copies of the agreement that BLACKWELL had previously emailed him. BLACKWELL asked the UCA if it was the same contract that he (BLACKWELL) had sent to the UCA and the UCA confirmed that it was.

22.    BLACKWELL and the UCA finalized and executed the agreement. After the signing of the two copies of the agreement, both BLACKWELL and the UCA kept a copy.

23.    BLACKWELL told the UCA that he had earned eighteen percent the previous month on investments, and that he was paying out between fifteen and fifty percent to clients every month. BLACKWELL told the UCA that his investors can expect a fifteen to twenty-five percent return. BLACKWELL told the UCA that he had never lost the principal investment in the last 6 years.

24.    After the meeting was over, the UCA left and BLACKWELL remained in the restaurant. Additional undercover agents who had been stationed in the restaurant to observe the meeting saw BLACKWELL tear up the signed contract received from the UCA and throw it into a trash can. The agents retrieved the documents out of the trash for evidentiary purposes.

25.    On August 31, 2010, the UCA and BLACKWELL spoke on the phone about an initial wire transfer to BLACKWELL's account. The UCA told BLACKWELL that he would send $1,000 to test and verify the banking transfer and then follow up with a $499,000 transfer to complete the agreed $500,000 investment. BLACKWELL asked the UCA to send $5,000 due to a minimum balance bank requirement. The UCA told BLACKWELL that he could not send the additional money and BLACKWELL asked the UCA to send whatever he could.

26.    On August 31, 2010, the UCA sent an email to BLACKWELL notifying him that the $1,000 wire transfer had been requested. BLACKWELL responded and told the UCA that he had "called DFW and had $4,000 put into the same account so it would meet the minimum now that it is funded."

**Criminal Complaint - Page 5**

27. On September 1, 2010, the UCA completed an electronic wire funds transfer as previously discussed with BLACKWELL. A total of $1,000 was sent as a test wire and initial investment to BLACKWELL's account at Wells Fargo Bank. The wire was sent according to the banking instructions provided to the UCA by BLACKWELL. BLACKWELL's account was entitled "Miller's A Game, LLC."

28. On October 4, 2010, BLACKWELL emailed the UCA what purported to be a Wells Fargo bank statement dated September 1 – 30, 2010 and entitled MILLERSAGAME, LLC # 5005477152. According to the statement, the account had a beginning balance of $0.00, a $5,000 deposit/credit, $0.00 withdrawals, and an ending balance of $5,000.

29. Agents obtained official records from Wells Fargo Bank for the MILLERSAGAME # 5005477152 account. Those records showed that the document emailed by BLACKWELL was fraudulent. The official bank statement shows a beginning balance of -$25.29, deposits/credits of $1,264.00, withdrawals of $1,145.46 and an ending balance of $93.25.

30. Agents were also able to determine from an examination of bank records that BLACKWELL used the UCA's $1,000 investment for BLACKWELL's personal use. The bank records indicated that upon receipt of the UCA's funds, BLACKWELL immediately began spending the said funds at restaurants, golf courses, convenience stores and made a cash withdrawal. The expenditures are commensurate with BLACKWELL's historical spending methods used with investor funds of prior unsuspecting victims.

## INTERSTATE WIRE COMMUNICATIONS

31. During the course of his scheme to defraud, and in furtherance of it, BLACKWELL caused a number of interstate wire communications to be sent. For instance, on January 20, 2009, acting on BLACKWELL's instructions, D.W. wired $75,000 from his Charles Schwab account via Wells Fargo Bank San Francisco, California to an account specified by BLACKWELL at Bank of America in New York, New York. Because BLACKWELL recruited investors from a variety of geographic areas, he made a large number of other interstate wire communications in furtherance of his scheme, including wire transfers of money, emails, and phone calls.

## CONCLUSION

32.   Based upon the foregoing facts and information, I submit there is probable cause to believe that BLACKWELL devised a scheme to defraud investors, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing that scheme, he caused to be transmitted by means of wire communication in interstate commerce certain signals and sounds, all done in violation of 18 U.S.C. §1343.

_____
George Ramirez
Special Agent, Homeland Security Investigations

**Sworn to before me, and subscribed in my presence**

April 14, 2011 at 2:59 pm.   at   Fort Worth, Texas
**Date and Time Issued**              **City and State**

**JEFFREY L. CURETON**
**UNITED STATES MAGISTRATE JUDGE**
**Name and Title of Judicial Officer**          **Signature of Judicial Officer**